FILED
01/05/2022
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 10, 2021 Session

## STATE OF TENNESSEE v. KEMONTEA DOVON MCKINNEY

**Appeal from the Circuit Court for Robertson County**
**No. 74CC2-2018-CR-186B    William R. Goodman, III, Judge**

_____

### No. M2020-00950-CCA-R3-CD
_____

The defendant, Kemontea Dovon McKinney, appeals his Robertson County Circuit Court jury convictions of aggravated robbery, first degree premeditated murder, first degree felony murder, and theft, arguing that the trial court erred by admitting his pretrial statement into evidence, that the evidence was insufficient to support his convictions, and that the evidence established that he acted in self-defense. Because the trial court erred by admitting the defendant's statement into evidence and because the error was not harmless beyond a reasonable doubt, the defendant's convictions are reversed and remanded for a new trial. Because the evidence was insufficient to support a conviction of first degree premeditated murder but sufficient to support a conviction of second degree murder, that conviction must be modified to one of second degree murder. The evidence was sufficient to support the jury verdicts of felony murder, aggravated robbery, and theft. Accordingly, we remand the case to the trial court for a new trial on two counts of felony murder, one count of second degree murder, one count of aggravated robbery, and, one count of theft of property.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Reversed and Remanded

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Gordon W. Rahn, Clarksville, Tennessee, for the appellant, Kemontea Dovon McKinney.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Jason White and James Milam, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The defendant was a juvenile at the time of the offenses and, after a hearing

in the juvenile court, his case was transferred to the Circuit Court for Robertson County on charges related to the death of the victim, Jonathan Outlaw. The Robertson County Grand Jury charged the defendant and two co-defendants, Ricardo Lamont Murray, Jr. and Johnathan D. Reed, by presentment with one count each of aggravated robbery and theft of property valued at $10,000 or more but less than $60,000, two counts of first degree felony murder, and one count of first degree premeditated murder.

The trial court severed the defendant's case from that of his co-defendants, and the defendant's trial occurred first.

At the July 2019 trial, Randy Scott Lower testified that on October 24, 2017, at approximately 6:30 p.m., he went to the Sudden Service gas station off the Maxey Road exit from Interstate 24 to meet a man from whom he was to purchase two mountain bicycles. When he "pulled into the parking lot," he noticed three or four African American "kids" on one side of the parking lot who were "checking out each other's cars or what not." He noticed that "[a] couple of them had hoods on," but he "didn't see them as a threat or anything." One of the vehicles was "a white Camaro" and the other was "a silver or black," Dodge car. While Mr. Lower was inspecting the bicycles, he heard what he thought were fireworks that the group of "kids" had thrown into the gravel. Mr. Lower "felt something hit me in the arm, so I kind of ducked at that point." It "took a second" for Mr. Lower to realize that someone was firing a gun and when he "stood up, . . . at that point, somebody was laying on their back and . . . the cars were speeding away." He discovered that he had been hit in the arm by a bullet fragment, which was later removed from his arm at the hospital.

Mr. Lower said that he checked on the victim, who was lying on his back on the ground and "was somewhat responsive" but "was losing consciousness." Mr. Lower saw what appeared to be a gunshot wound on the victim's chest. He noticed that the victim's pulse "was getting weaker" and performed CPR while someone else applied pressure to the wound. He estimated that an ambulance arrived within five to 10 minutes. Mr. Lower said that the victim had "a weapon in his holster of his pants."

During cross-examination, Mr. Lower testified that it "was getting dark" at the time of the shooting.

Christopher Mullins testified that he and his wife went to the Sudden Service gas station to sell two mountain bicycles to Mr. Lower. While he was standing near his truck, a white Camaro and a black Dodge Challenger pulled up 12 to 15 feet away. Mr. Mullins said that an "older gentleman" was driving the Camaro and three or four younger men got out of the Challenger. He described three of the men: "[O]ne of them was wearing a pretty bright colored hoodie, had his hood up the entire time." Another man was "wearing

-2-

a white top and some red pants" and had "long dreads." The third man was a "somewhat bigger guy and he was wearing a black hoodie." Mr. Mullins heard the men "laughing, cutting up, just talking to each other," and he "figured it was just a couple of people that knew each other and was just sitting there hanging out." It appeared to Mr. Mullins as though "they were showing . . . their cars off to each other" or "trying to sell [a] car." When Mr. Mullins and Mr. Lower began to unload the bicycles from Mr. Mullins' truck, "we heard noise that kind of sounded like firecrackers." Mr. Mullins "looked over and . . . saw another shot go off and that's when the gentleman just collapsed on the ground." He said that he saw the man in the brightly-colored hooded sweatshirt fire the second shot and "then . . . [take] off behind the gas station" and that the "[C]hallenger actually turned itself around and went back behind" the gas station. The Camaro "fled straight off through the parking lot towards the interstate." Mr. Mullins discovered that "some kind of ricochet or something came up and hit [his] truck and left a pretty good dent in it and chipped some paint off of it."

During cross-examination, Mr. Mullins recalled hearing two gunshots. He saw the second gunshot, which hit the victim, causing him to fall "to the ground."

Robertson County Sheriff's Office ("RCSO") Deputy Bailey Jones testified that he responded to a shooting at the Sudden Service gas station in Robertson County on October 24, 2017. When he arrived, another deputy was performing CPR on the victim, and Deputy Jones cleared the scene and took several photographs. Officers discovered "a pistol still in the holster on the victim's side." Deputy Jones collected statements from witnesses and escorted the victim's body to the Nashville Medical Examiner's Office. While in Nashville, Deputy Jones received a call to respond to a location where a white Camaro had been found, "wrecked into the side of [a] car wash." He also responded to a location where a black Dodge vehicle had been found. Deputy Jones ensured that both vehicles were towed to Robertson County and secured as evidence.

On cross-examination, Deputy Jones said that the victim's firearm was in a plastic holster on the victim's right side. He said that the holster did not have any kind of strap by which to secure the weapon.

RCSO Sergeant Nick Roberts testified that he was the night shift supervisor at the time of the shooting. He responded to the Sudden Service gas station, also known as the "Maxey Road BP," and helped secure the scene. He got descriptions of the involved vehicles from witnesses and security video recordings from the gas station. He said that the victim had a loaded, "holstered semi-automatic pistol" in his waistband. He described the victim's holster as "an inside-the-waistband" holster that was "not an active retention holster" and was designed to "sit inside the waistband for full concealment" but did not "require you to press any buttons or turn any type of active retention off to get the pistol

-3-

out of the holster."

During cross-examination, Sergeant Roberts said that if the victim's holster had "any type of retention, it would have been a dimple retention," by which the firearm is released by "just pull[ing] it" out.

John Outlaw, the victim's father, testified that he was with the victim on October 24, 2017. He said that the victim, who was living with him at the time, was trying to sell a white, 2015 Chevrolet Camaro using Craigslist and had arranged to meet a potential buyer on October 24. The victim called Mr. Outlaw while en route to the Sudden Service gas station and told him that he had forgotten to bring the vehicle's title with him, and Mr. Outlaw agreed to bring him the title. While Mr. Outlaw was driving to the gas station, he received a telephone call from a police officer, informing him that there had been a homicide and asking him to return home to meet with officers. Mr. Outlaw said that the victim had approximately 13 years of law enforcement experience and had a permit to carry a concealed firearm. He said that it was common for the victim to carry a firearm when he was "dealing with someone he didn't know" and that, to his knowledge, the victim did not know the men that he was meeting.

David Dowlen worked for Hollingsworth Oil Company, the owner of the Sudden Service Convenience Stores, and was in charge of the video surveillance systems at all Sudden Service gas stations. At the time of the shooting, the Sudden Service on Maxey Road used a multi-media DVR security system, which Mr. Dowlen estimated to have a quality of "five or five and a half" on "a scale of one to ten." There were five cameras located outside of the store, which cameras did not capture audio. Mr. Dowlen explained that a camera's exposure to sunlight can dull the quality of the recording over time. He copied the video footage from the night of the shooting for the police officers.

During cross-examination, Mr. Dowlen acknowledged that the video quality was poor because of the sunlight damage to the camera lenses. He explained that the choppiness to the video was due to his setting the system to capture three frames per second.

Lieutenant Wayne Carlyle, a Sergeant at the time of the shooting, collected evidence from the scene, including "a spent projectile" and "empty shell casings" from a ".9 millimeter handgun." Lieutenant Carlyle collected the victim's cellular telephone into evidence, and Mr. Outlaw provided him with the passcode to access the telephone. Based on the victim's text messages, Lieutenant Carlyle deduced that the victim had gone to the Sudden Service gas station "to show off a white Chevy Camaro with the possibility of selling it." From the video surveillance footage, he determined that the incident involved the victim's white Camaro and a black Dodge car. Sometime after 9:00 p.m., officers

-4-

found the victim's Camaro at "a car wash on Murfreesboro Road in Nashville" and the Dodge car in an alley near the car wash. Inside the console area of the Camaro, Lieutenant Carlyle found a "flip phone," "a time card receipt from Wendy's," and a "Taurus TCP .380 caliber pistol." The time card receipt indicated that a Wendy's employee named Stan Quinton Reffege clocked out of work after the time of the shooting, which indicated that Mr. Reffege "had been inside that vehicle after the incident occurred." Two detectives interviewed Mr. Reffege and his mother and developed Mr. Reffege's brother, Ricardo Murray, as a suspect.

Lieutenant Carlyle also determined from the video surveillance footage that the shooter was wearing a "bright yellow/green" or "chartreuse" colored hooded sweatshirt with "dark accents." The next day, a detective received a call from an anonymous person, reporting that the shooter's name was "Kemontea McKinney." Lieutenant Carlyle searched this name in Facebook and found the defendant's public Facebook profile on which the defendant had posted a photograph of himself "dressed in a hoodie very similar to the one that we had on video." Lieutenant Carlyle and three other RCSO detectives, driving two unmarked vehicles, met two deputies from the Montgomery County Sheriff's Office ("MCSO") and followed them to the defendant's Clarksville home. RCSO Detective Charles Arms and at least one of the MCSO deputies went inside the defendant's home, and a short time later, the officers transported the defendant to the sheriff's office. Lieutenant Carlyle said that the defendant remained unhandcuffed during transport but that he rode in the back of a police vehicle. The defendant's mother met them at the RCSO and was present while two detectives interviewed the defendant. From that interview, Lieutenant Carlyle learned that a firearm may have been thrown into an area behind the Sudden Service gas station. Lieutenant Carlyle and three other officers did a "thorough" and "very detailed search" of the outside area of the Sudden Service property and "did a looser search of the adjoining hay field" and a nearby abandoned lot but did not find any firearms.

Stan Quinton Reffege testified that he had known the defendant for five or six years and that the defendant was "basically like a brother" to him. Mr. Reffege said that in October 2017, he lived in Nashville and worked at a Wendy's restaurant on Thompson Lane. On October 24, 2017, his brother, Mr. Murray, picked him up from work at approximately 9:00 or 10:00 p.m. driving a white sports car with the defendant in the passenger's seat. Mr. Reffege said that he had never seen the vehicle before. Mr. Murray drove Mr. Reffege home, which took 30 to 40 minutes, and Mr. Murray and the defendant drove away. Later that night detectives came to Mr. Reffege's house to question him about the incident.

On cross-examination, Mr. Reffege said that the defendant ordinarily wore "button-up collar shirts" and that he had, on occasion, seen the defendant wear a hooded

-5-

sweatshirt "with a picture on it." Mr. Reffege said that he had never known the defendant to be in trouble and that he trusted the defendant. The defendant had a child, and Mr. Reffege said that the defendant enjoyed spending time with his child and being a father.

On redirect examination, Mr. Reffege said that the defendant spent a lot of time with Mr. Reffege's family and that he was not surprised to see the defendant in a vehicle with Mr. Murray. He also said that he did not know what Mr. Murray and the defendant had been doing before they arrived to pick him up from work.

Doctor Emily Dennison, an expert in forensic pathology, testified that she performed the victim's autopsy. Doctor Dennison determined that the victim died from a single, "perforating gunshot wound, which means through and through, goes in and comes out through the chest."

During cross-examination, Doctor Dennison testified that the bullet that hit the victim was traveling from back to front and from left to right.

Metropolitan Nashville Police Department ("Metro") Officer Blaize Williams testified that he had heard an alert to be on the lookout ("BOLO") for a white Camaro, and on Interstate 24 eastbound, he and a partner saw a white Camaro and a black Dodge "Charger or Challenger speeding" in the left lane. Officer Williams said that the officers were driving approximately 130 miles per hour, "and we couldn't catch up." The two vehicles exited the interstate at the Hickory Hollow Parkway exit, and the officers followed them. Officer Williams acknowledged that the officers "never initiated our emergency equipment" because "we never got close enough." The white Camaro was driving behind the black vehicle, and Officer Williams noted that the "BOLO was for . . . the stolen white Camaro. We didn't know what the other vehicle was, as far as if it was stolen or what its involvement was." At some point, the Camaro turned onto Old Murfreesboro Road and, after "On-Star was able to disable the vehicle," Officer Williams saw a black male "jump[] out of the driver's seat of the Camaro" while "[t]he Camaro kept kind of rolling" until it "hit a car wash." Officer Williams chased the man into "a dense wooded area" where officers "set up a perimeter . . . and K-9 searched for probably an hour," but they did not find the man. A few days later, Mr. Murray turned himself in to Robertson County detectives, and Officer Williams recognized him as the man he had seen run from the Camaro.

RCSO Detective Darren Hawkins testified that on the night of the shooting, he notified the victim's father of the incident. Two days later, he went to Clarksville to help bring the defendant in for questioning. He said that the defendant and his mother agreed to go with the officers. Officer Hawkins collected the defendant's cellular telephone into evidence. In preparation for trial, Officer Hawkins took Mr. Outlaw to a

secured lot where the white Camaro was being held for evidence, and Mr. Outlaw verified by the VIN that the Camaro in evidence was the victim's vehicle.

Jimmy Grogan testified as an expert in determining the value of motor vehicles and determined the value of the victim's 2015 Camaro to be $22,500. He explained that it was not unusual for a seller to "ask a little bit more than you will take" and was not surprised that the victim advertised the vehicle for $26,500.

RCSO Detective James Kendrick testified that in October 2017, he worked in the Criminal Investigations Department, investigating "[c]hild sex abuse, adult sex crimes, [and] personal crimes." He said that he received specialized training on how to interview adolescents, noting, "There's a difference between interviewing adolescents versus an adult." When interviewing an adolescent, it was his practice to "meet with the parents firs[t] to talk to them about the case, what the situation was and then leave it up to them whether or not they wanted to be present during the interview with the child."

On October 26, 2017, Detective Kendrick was asked to help Detective Arms interview the 17-year-old defendant. He said that the interview room remained unlocked and that the defendant's mother was present during the entire interview. The detectives began the interview with "a little bit of small talk." Detective Kendrick said that Detective Arms then gave the defendant his *Miranda* warnings and that the defendant signed a waiver and agreed to speak with the detectives. Detective Kendrick described his interview technique as "more passive" in an attempt "to minimize the moral seriousness of what he did in order to get him . . . to talk to us and give us more information." During the interview, the defendant "mentioned . . . that he had tossed the weapon," and officers went to the Sudden Service gas station to look for it. Officers also worked to identify the third person involved in the shooting.

At some point during the interview, the defendant's mother left the room at the officers' request. After the detectives told the defendant that he would be charged, Detective Arms left the interview room to "prepar[e] his charges through the juvenile citation" and to "contact the juvenile youth services officer." Detective Kendrick said that the defendant gave the detectives the passcode to his cellular telephone during the interview, and Detective Kendrick turned over the telephone and the passcode to Deputy Jason Putnam for data extraction. Detective Kendrick showed the defendant some pictures in an attempt to identify the third suspect, after which, the defendant and his mother were left alone in the interview room. The defendant was then taken into custody.

The jury viewed the video recording of the interview in which the defendant admitted shooting the victim. In the interview, the defendant also acknowledged that he was wearing a lime green hooded sweatshirt that night and that he threw it away when he

-7-

returned to his friend's apartment.

During cross-examination, Detective Kendrick said that he knew that the defendant was a juvenile when he interviewed him. He acknowledged that it was unlikely that the defendant had previously been subjected to an interrogation because the defendant and his mother both emphasized that the defendant had not been in trouble before. Detective Kendrick said that the defendant was cooperative during the interview and that the defendant and his mother agreed for the defendant to provide a DNA sample. Detective Kendrick said that the defendant initially said that he went to the gas station to look at the Camaro and denied that he knew of Mr. Murray's plan to steal the car but later acknowledged that Mr. Murray and a man he knew only as "Rambo"—later identified as Johnathan Reed—had discussed stealing the Camaro on the way to the gas station.

On redirect examination, Detective Kendrick acknowledged that the defendant told the detectives that he shot the victim because he was threatened by the co-defendants. Specifically, the defendant reported "that he was threatened that if something happened and he didn't do anything, that they were going to harm his family." Detective Kendrick said that as the interview progressed, the defendant changed his story and said that he shot the victim because the victim had reached for the gun on his hip.

RCSO Detective Jason Putnam testified as an expert in cellular telephone data extraction. Detective Putnam examined the defendant's cellular telephone and used the passcode that the defendant provided during his interview to unlock it. He said that without the passcode, he "would not have been able to do the extraction." On the defendant's telephone, Detective Putnam found a photograph taken at 6:18 p.m. on the day of the shooting showing someone wearing "a lime green colored shirt" with two handguns in his lap. He also "found one entry" on the telephone indicating that the telephone had been on Maxey Road at some point, but he could not determine the date or time of that entry. Among the defendant's many text messages from October 24, 2017, Detective Putnam found a message sent at 6:11 p.m. that read, "I'm finaah go handle some business." An incoming message from a number identified in the defendant's telephone as "baby" said, "[N]o, stay where you at." The defendant responded at 6:19 p.m. with the photograph of the handguns and the text message, "I'm already ina kar bae."

Metro Officer Andrew Pedrotty testified that on August 13, 2018, he and two other officers effectuated a traffic stop on a brown Buick because neither the driver nor the front-seat passenger were wearing seatbelts. During the traffic stop, officers searched the vehicle and found a "Springfield .9 millimeter handgun" in "the driver's side compartment of the vehicle."

Metro Sergeant Michael Vaughn, who was with Officer Pedrotty during the

-8-

August 13, 2018 traffic stop, testified that he recovered a Springfield handgun from underneath the driver's seat and that the gun was loaded with at least eight rounds in the magazine.

RCSO Detective Charles Arms was the lead investigator in this case. When he arrived at the Sudden Service gas station, he found two shell casings and a bullet fragment on the ground near the victim. He searched a police database using the victim's driver's license information and learned that the victim owned a white 2015 Camaro, which vehicle was not at the scene. On the victim's cellular telephone, he found text messages that indicated the victim was at the gas station to meet a potential buyer for the Camaro. Detective Arms called On-Star to locate the vehicle and learned that the car was "active and it's moving." He asked Metro officers to respond to the Camaro's location and detain the driver. When he arrived at the car wash where the Camaro was found, he recovered a pistol, a cellular telephone, and a Wendy's employee time clock receipt for Mr. Reffege. Detective Arms went to Mr. Reffege's house with Lieutenant Carlyle and Deputy Jones. Mr. Reffege identified the telephone number with which the victim had been communicating about the sale of the Camaro as Mr. Murray's number.

The day after the shooting, Detective Arms received a telephone call from Mr. Murray "from a blocked number, wanting to have a conversation with me over the phone, but it didn't go anywhere." The next day, he received an anonymous telephone call identifying the defendant as the person who shot the victim. At the defendant's house in Clarksville, Detective Arms knocked on the door and told the defendant's mother's boyfriend, Thomas Johnson, that he needed to speak with the defendant. Mr. Johnson called for the defendant, who met the officers in the living room. When Mr. Johnson began asking the officers their purpose in being there, Detective Arms reiterated that he needed to speak with the defendant. Detective Arms said that he spoke to the defendant's mother on the telephone and told her that he needed to speak with the defendant but that he could not do that without her present. Because the defendant's mother was in Nashville at the time, Detective Arms asked her to meet the officers in Springfield and got her permission to transport the defendant to the RCSO in Springfield. Detective Arms said that the defendant was transported "in the back of the [police] vehicle just like any other person" but was not handcuffed. Detective Brett Keck rode in the back of the vehicle with the defendant. Detective Arms denied that any of the officers asked the defendant any questions about the incident on October 24 during the drive. The defendant's mother met them outside of the sheriff's office, and they "all walked into the door together" and directly to the interview room.

Detective Arms testified that before beginning the defendant's interview, he read a rights waiver form verbatim to the defendant and asked the defendant whether he understood. He said that the defendant did not have any questions about the waiver and

that he signed the form. He also said that he did not have any indication that the defendant did not understand what he was signing. Detective Arms said that during the interview, the defendant first said that he shot at the victim because the men he was with "had told him they were going to hurt him, they are going to hurt his family if he doesn't do something." Later, the defendant said that he shot the victim because he saw the victim reach for his gun.

Based on the defendant's describing the gun he used as "a brown gun," Detective Arms determined that it matched one of the guns in the photograph from the defendant's cellular telephone depicting two handguns in someone's lap. The other gun in the picture was determined to be the Taurus gun found in the Camaro. Detective Arms later determined that the gun recovered in the traffic stop on August 13, 2018, by Officer Pedrotty matched the Springfield gun seen in the picture that the defendant said he had used to shoot the victim. He also later determined that the man the defendant referred to as "Rambo" was Mr. Reed.

During cross-examination, Detective Arms acknowledged that this was the first case on which he had served as the lead investigator. He said that the Wendy's time clock receipt was found in the backseat of the Camaro whereas the cellular telephone and gun were found in the console area of the vehicle. Detective Arms acknowledged that all of the text messages regarding the sale of the Camaro were between the victim and Mr. Murray and that the victim had no communication with the defendant. Detective Arms said that when he went to the defendant's house, the defendant was cooperative but appeared emotional and "was clutching [an] infant. He picked the infant up and was hugging him." Although the defendant was not crying, Detective Arms noticed that he had "wet eyes."

Detective Arms acknowledged that in the video surveillance footage, the victim could be seen reaching toward his right hip as Mr. Murray drove away in the Camaro, and the man in the brightly-colored, hooded sweatshirt could be seen taking steps backwards before shooting.

On redirect examination, Detective Arms testified that the defendant acknowledged that he was the man in the brightly-colored, hooded sweatshirt seen on the surveillance video. He said that as the Camaro drove away, the victim had his back to the defendant and at no time, turned to face him.

Tennessee Bureau of Investigation ("TBI") Special Agent Michael Turbeville testified as an expert in DNA analysis and serology. He identified Mr. Murray as the major contributor of DNA on a pair of pants recovered from the Camaro and on a pair of pants recovered from the Challenger. On the sweat band of a hat recovered from

-10-

the Camaro, he identified the victim as the major DNA contributor. He also identified Mr. Murray as a major contributor of DNA found on the "inside driver door button and textured handle of [the] black Challenger."

On cross-examination, Agent Turbeville acknowledged that he did not find a conclusive match of the defendant's DNA on any item he tested.

TBI Special Agent John Dunn testified as an expert in fingerprint analysis. He identified prints belonging to Mr. Reed on the outside of the driver's door and the review mirror of the Challenger and on the trunk of the Camaro. He found prints belonging to Mr. Murray on the front bumper and overhead light of the Camaro and on a cup recovered from inside the Camaro. He found one print belonging to Mr. Reffege on the "exterior of the passenger side window of the Dodge Challenger." Agent Dunn compared all of the unidentified prints from both vehicles to the defendant's prints and determined that the defendant was excluded as the contributor as to six of the prints and that the remaining prints were inconclusive.

During cross-examination, Agent Dunn acknowledged that he was unable to match the defendant's prints to any found on the vehicles or the items inside of the vehicles.

TBI Special Agent Joseph Kennedy testified as an expert in firearm and tool mark identification. Agent Kennedy determined that the two cartridge casings collected from the scene were ".9 millimeter Luger Plus P" cartridges. He concluded that those casings were not fired from the Taurus handgun that was recovered from the Camaro but that they had been fired from the Springfield Armory nine-millimeter pistol that was seen in the photograph on the defendant's cellular telephone and that had been recovered in August 2018. Agent Kennedy said that the bullet fragments recovered in this case could have been fired from the Springfield pistol but that the "similarities are insufficient for a more conclusive determination."

The State rested. After a *Momon* colloquy, the defendant elected to testify.

The defendant testified that his birthdate was December 29, 1999, and that he was 17 years old at the time of the offenses in this case. He said that he was a good friend of Mr. Murray and Mr. Reffege. He said that on October 24, 2017, he was "hanging out" at an apartment in Nashville with some friends when he received a telephone call from Mr. Murray between 5:00 and 6:00 p.m. Mr. Murray met the defendant at the apartment and asked him to "go look at" a white Camaro in Clarksville with him. The defendant denied that Mr. Murray told him that he was planning to steal the car. Mr. Reed joined them, and the three men drove away in a black Dodge Challenger, which vehicle the defendant said he had not seen before. Mr. Murray drove the Challenger, Mr. Reed sat in

the front passenger's seat, and the defendant sat in the backseat.

The defendant said that the three men were "chatting and listening to music" during the drive. He acknowledged that he took a photograph with his telephone of two guns in his lap. He said that the "brown and black one" was his and that the other gun was Mr. Murray's. The defendant explained that Mr. Murray's gun slid out from underneath the seat, and he picked it up and took a photograph of both guns "[j]ust to show off . . . to my friends." The defendant put his gun in the pocket of his gym shorts which he was wearing underneath his pants, and he returned Mr. Murray's gun to him. The defendant acknowledged that he texted the photograph to "[t]his girl I used to talk to" with a message that said he was going to take care of business. He said that by "business," he meant that he was "[a]bout to go with my friends and look at this car." He reiterated that he had no knowledge of any plan to steal the car.

At the Sudden Service gas station, the three men got out and spoke with the victim and looked at his Camaro. The defendant denied that he showed the victim his weapon. The victim opened the hood of the Camaro for Mr. Murray to look at the engine. The defendant said that once the hood was closed, Mr. Murray got into the car, and the defendant and the victim walked to the back of the car to "look at the pipes." As the victim was walking toward the passenger door of the car, Mr. Murray began to drive away, which "shocked" the defendant. The defendant said that the victim "was reaching for the door handle and as he reached for the door handle, he was . . . I guess reaching for his gun." The defendant said that he saw the victim's hand on his gun and became scared, thinking, "[M]y life is in danger." The defendant said that he "[s]tarted backing back, and my hands was in my coat pocket and I pulled my hands out of my coat pocket and reached in my gym shorts and grabbed the gun." "That's when I started backing back and I shot." The defendant remembered shooting only one time but acknowledged that the evidence indicated that he fired two shots. The defendant explained that he was "[j]ust firing wildly," trying to get away.

The defendant said that he "ran to the back of the store" and that Mr. Reed drove the Challenger to meet him. The defendant got in the car with Mr. Reed, and they drove back to the apartment where they had begun their night. The defendant asked Mr. Murray "why did you take the car and like what are you doing?" He then asked Mr. Murray to "drop him off" at his son's mother's house. The defendant said that they stopped to pick up Mr. Reffege from Wendy's. Mr. Murray dropped off Mr. Reffege first and then dropped off the defendant. The defendant said that Mr. Murray threatened him after the shooting. He said that he told Mr. Murray that he "was going to turn myself in" but that Mr. Murray warned him "don't snitch, don't tell or nothing" and threatened him.

The defendant acknowledged that he lied to the detectives about throwing

-12-

the gun behind the gas station, explaining that he "was scared, I was just trying to get myself out of trouble and I didn't know what to do or what to say." He also acknowledged that he lied when he told the detectives that Mr. Murray had threatened him on the way to meet the victim because he was "trying to get myself out of trouble and I didn't know what to do."

The defendant testified that he had told his mother what had happened and that, together, they planned for the defendant to turn himself in when his mother got off of work the next day at approximately 7:00 p.m. He said that they decided to wait until the next day "[s]o I could spend time with my son and my family." Before his mother came home from work, however, the detectives arrived at his house and asked him to come with them to the sheriff's office for questioning. The defendant recalled that his mother met them at the RCSO and was in the room during his interview with detectives Arms and Kendrick. The defendant said that he was "[t]errified" because he had "never been in nothing like that. I didn't know what to do." He acknowledged that the detectives were respectful to him and did not threaten him. The defendant denied that he went to the Sudden Service gas station with the intent to steal the Camaro or to help Mr. Murray and Mr. Reed do so.

During cross-examination, the defendant said that the week of the shooting, he had been in Nashville because he was on fall break from school. During that time, he stayed with his child's mother. The defendant acknowledged that he had a gun with him while he was hanging out at a friend's apartment on the day of the shooting. He said that he carried a gun "[b]ecause the apartments they was in, it's known for violence and stuff and I was trying to be protected." The defendant testified that he had found the gun in the woods approximately a month prior. He said that shortly before he had found the gun, he was held at gunpoint by an acquaintance of his child's mother and that, based on that experience, he decided to keep the gun for protection.

The defendant reiterated that he had not seen Mr. Murray drive the Dodge Challenger before he came to pick him up on October 24. He said that he asked Mr. Murray about it but otherwise was not concerned about it. The defendant said that he took his gun with him to go look at the victim's car because he "didn't have nobody else to leave it to." He reiterated that he shot the victim because, after Mr. Murray drove away in the Camaro, he saw the victim "put[] his hand on his hip, he moved his shirt up and I could tell he reached for his gun." The defendant added, "I wasn't meaning to kill him. I was just shooting—I just shot." He acknowledged that after he shot the victim, he ran behind the store and left the scene in the Dodge Challenger. He also acknowledged that he did not call 9-1-1 or seek to render aid to the victim, saying, "My seventeen [sic] mind wasn't thinking like that." He explained that he was not fully truthful in his interview with the detectives because he "was trying to get myself out of trouble."

-13-

The defendant acknowledged that he put his green hooded sweatshirt in the garbage at his child's mother's house and that he gave his gun to someone that he knew only as "Cue" "to get rid of it."

The defendant rested.

The jury accredited the State's evidence and convicted the defendant as charged. After a sentencing hearing, the trial court merged the theft conviction with the aggravated robbery conviction and the two first degree felony murder convictions with the first degree premeditated murder conviction and imposed an effective life sentence.

Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the trial court erred by denying his motion to suppress his pretrial statement, that the evidence at trial was insufficient to support his convictions, and that the evidence established beyond a reasonable doubt that he acted in self-defense.

## I. Motion to Suppress

Before trial, the defendant moved to suppress the statement he gave to detectives Arms and Kendrick on October 26, 2017, arguing that he did not knowingly and voluntarily waive his rights. The trial court held a hearing to determine the admissibility of the defendant's pretrial statement.

At the May 2, 2019 hearing, Detective Charles Arms testified much as he did at trial. He said that, based on the victim's text messages, he determined that the victim was at the Sudden Service gas station to show his white Camaro to a potential buyer. From the surveillance footage, he saw that three men had stolen the victim's Camaro and that a person "wearing a bright green hoodie" with a black stripe on the side shot the victim. Two days later, Detective Arms developed the defendant as a suspect and searched the defendant's public social media accounts. On the defendant's public Facebook page, the detective found a photograph of a person wearing "a bright green hoodie" with a black stripe on the side.

In coordination with the MCSO, Detective Arms and several other RCSO detectives went to the defendant's Clarksville home in three unmarked vehicles. Detective Arms and one MCSO officer knocked on the door of the house and asked the defendant's mother's boyfriend, Thomas Johnson, if the defendant was home. Detective Arms said that both he and the other officer were armed but that they did not have their weapons drawn. He said that Mr. Johnson invited the officers in and called for the defendant, who

-14-

came into the living room, picked up his infant son from a rocker, and sat down. Detective Arms heard Mr. Johnson "say[] something to the effect of he shouldn't have been there, shouldn't have ever done that." Detective Arms said that he had not yet told the defendant or Mr. Johnson why they wanted to talk with the defendant but that Mr. Johnson asked the officers if he could call his sister who was a lawyer. Based on Mr. Johnson's reaction, Detective Arms inferred that Mr. Johnson and the defendant knew why the officers were there. Detective Arms said that he and the defendant made small talk while Mr. Johnson was on the telephone. Mr. Johnson consented to the defendant's going with the officers but said that he could not accompany the defendant because he could not leave the other children alone. Detective Arms spoke to the defendant's mother, Shareka McKinney, over the phone, and she agreed to meet the officers and the defendant at the RCSO in Springfield.

Detective Arms described the defendant as "[q]uiet" but otherwise not reluctant to go with the officers. The officers allowed the defendant to put on some shoes, and the defendant "walked with us to our vehicle." Detective Arms denied that the defendant was in custody at that time and said that the defendant was not handcuffed or otherwise restrained. The defendant rode in the backseat of one of the unmarked vehicles, and Detective Keck rode beside him. Detective Arms said that the "unmarked vehicles don't have cages in there, so they are just like regular vehicles," including that the back doors can be opened from the inside.

Detective Arms acknowledged that he chatted with the defendant during the 45-minute drive to the sheriff's office but denied that they talked about the case. He said that they talked about "life, food, [and] basketball." They also "[t]alked about NBA 2K, a basketball game that is played on PS4 and Xbox" video game systems. Detective Arms said that the game required the player "to be somewhat intelligent, because you can't just pick up a controller and play," noting that the player has to "be able to push buttons, you have to be able to understand what is happening on the screen to coordinate with your fingers to make sure that you are playing correctly." He also said that a player has to be able to read to play the game. Based on their conversation, Detective Arms concluded that the defendant was experienced in playing the video game.

Detective Arms testified that the defendant exhibited no signs of intoxication or being under the influence of any substance. He said that the defendant did not display any signs of a diminished mental capacity, noting, "He was articulate in his answers. He didn't ask me to repeat myself. He didn't ask, I don't understand? . . . It was like having a normal conversation with someone, just day to day." Ms. McKinney met them outside of the sheriff's office, and they all walked directly to the interview room. Detective Arms said that Ms. McKinney did not indicate that she wanted to take the defendant home, and he believed that she knew why the detectives wanted to interview the defendant. Detective

-15-

Arms described the interview room as being in an area of the building that had controlled entry but that "you can get out and walk out" freely. He acknowledged that he did not explain to the defendant that he could leave that area of the building without needing to be let out by an officer. He said that the defendant remained unrestrained in the interview room and that, although the door was closed, it was not locked. The entire interview was video recorded.

Detectives Arms said that he and Detective Kendrick entered the interview room together and that they began with three to four minutes of small talk before giving the defendant *Miranda* warnings. Detective Arms said that the defendant and Ms. McKinney nodded their heads in understanding as the defendant's rights were read and that neither had questions. Detective Arms asserted that he had no reservation as to the defendant's understanding what was being read to him. After reading the rights, Detective Arms asked the defendant whether he understood what was read, and the defendant "nodded, yes." Detective Arms said that he believed the defendant understood his rights. The defendant signed the waiver of rights, and the detectives began questioning him about the shooting. Detective Arms said that nothing in the interview indicated to him that the defendant was impaired or suffering from a mental disorder. He also said that Ms. McKinney did not have any questions about the interview procedure or otherwise indicate that she had concerns about the detectives' questioning the defendant.

The video recording of the interview was exhibited to the detective's testimony, which recording showed that the defendant and Ms. McKinney were left alone in the interview room for several minutes. During that time, the defendant asked Ms. McKinney about talking to the detectives, and Ms. McKinney responded, "Tell them what you know." When the detectives entered, they initiated small talk with the defendant and Ms. McKinney, asking about the defendant's son and Ms. McKinney's other children. Detective Kendrick shifted the conversation to the investigation and said, "We've got some questions we want to ask, . . . but we need to do everything we're supposed to." Detective Kendrick then explained that Detective Arms was going to read the defendant his rights and said that the detectives then "want[ed] to hear . . . what's going on." Detective Arms read the *Miranda* warnings hastily and without intonation or inflection in his voice, a clear departure from his speaking voice. After reading the warnings from the waiver form, Detective Arms asked the defendant if he understood, and the defendant indicated that he did. Detective Arms, while indicating where the defendant should sign the form, said, "All you have to do -- and this is just saying that I . . . read this." While Detective Arms filled in some information on the waiver form, both detectives continued to talk to the defendant and Ms. McKinney about their children. When Detective Arms handed the defendant the waiver form to sign, Detective Kendrick continued talking to Ms. McKinney about her children. At no point did either detective ask the defendant if he agreed to waive his rights.

During cross-examination, Detective Arms acknowledged that his training included only "very, very little" information on interrogation of juveniles. He said that six officers and three police vehicles went to the defendant's house two days after the shooting. He acknowledged that when he spoke to Ms. McKinney on the telephone, he did not offer to wait for her to come home but instead asked her to meet them at the RCSO. He explained that to get to the interview room, they went through four sets of doors, all of which were locked and audibly latched behind them. He acknowledged that he did not explain to the defendant or Ms. McKinney where he was taking them or what was to occur. He described the interview room as "eight by eight" with a table and two windows. Ms. McKinney sat next to the defendant, and the detectives sat opposite them.

Detective Arms explained that Detective Kendrick was present during the interview because of his experience "interviewing children" for a number of years. Detective Arms acknowledged that he had "never interviewed a murder suspect before." He denied that he read the *Miranda* warnings quickly, saying, "I read them like I normally do anything else." He acknowledged that Detective Kendrick remarked that it often takes officers two minutes to read through the warnings. Detective Arms also acknowledged that the detectives made small talk while the defendant was given the waiver of rights form to sign but insisted that the defendant and Ms. McKinney had the opportunity to read and review the waiver form, ask questions, and discuss the matter with each other. "[T]hey just didn't take it."

On redirect examination, Detective Arms said that the defendant and Ms. McKinney both indicated their understanding of the defendant's rights by nodding their heads. He reiterated that he had no concerns about their understanding the warnings.

The State exhibited the defendant's psychological evaluation to the hearing and rested.

The defendant called Shareka McKinney, the defendant's mother, who testified that the defendant was 17 years old at the time of the offenses. She said that she was at work when the officers came to her house to speak with the defendant. When Mr. Johnson called to tell her that the police wanted to speak with the defendant, she left work early and drove to the RCSO, where she waited outside until the officers arrived with the defendant. She said that as Detective Arms walked them to the interview room, he did not explain what would happen next. She said that she had never before been in a police interrogation and that she wanted the interview to be conducted at her house but that that was not an option. Ms. McKinney did not believe that she and the defendant were free to leave during the interview. She said that she "was just nervous and terrified."

Ms. McKinney recalled that Detective Arms read the *Miranda* warnings

-17-

"pretty fast, because being myself, I didn't really understand it either." She clarified that she did not understand "[w]hat it meant." She said that she did not discuss the warnings with the defendant but acknowledged that she had the opportunity to do so "[r]ight after he spoke the rights." She said that immediately after Detective Arms finished reading the rights waiver and while the defendant signed the waiver, the detectives "started talking about my other kids and . . . [the defendant's] son, and said that he is a big Lebron fan and grew up to play basketball and stuff." Ms. McKinney said that she did not tell the detectives that she did not understand the defendant's rights because "my mind was just everywhere and I just didn't think, you know, to ask what it was about."

Ms. McKinney testified that the defendant was attending high school through online classes at the time. She said that the defendant was a good student and "tried to stay focused in school, got along with others, did great with the teachers and stuff." She said that the defendant maintained good grades but "had a little trouble in reading and math" and took special education courses for those subjects. She said that he began the special education courses in the fourth grade and continued through high school. She said that the defendant "could read, but just certain stuff he couldn't understand." She continued, "Certain words, he knows but then he couldn't understand what the meaning of the word means." She said that the defendant's difficulty understanding the meaning of a word made it difficult for him to comprehend entire sentences. Ms. McKinney said that the defendant was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") at age eight or nine and that he was treated with medication that was effective. The defendant stopped taking the medication in the eighth grade because "[w]e just didn't never go back to -- you know, to get it prescribed."

During cross-examination, Ms. McKinney said that the defendant had worked at a Kentucky Fried Chicken ("KFC") restaurant for "about four months" as a cook and cashier. She said that the defendant successfully worked the drive-through window of the restaurant, which, she acknowledged, required multi-tasking of running the cash register and taking orders simultaneously. She said that the defendant also worked as a server for a caterer for two months. Ms. McKinney acknowledged that she did not tell Detective Arms that she wanted to take the defendant home or that she wanted them to conduct the interview at her house. She also acknowledged that she did not ask to speak to the defendant alone but said that she and the defendant sat alone in the interview room for eight minutes before the detectives came in. She said that she "knew some what he was talking about" when Detective Arms read the defendant's rights. She acknowledged that the defendant told the detectives that he understood the rights that had been read to him. She said that the defendant had a learning disability, although some of the defendant's school records indicated otherwise. She explained that he was in special education courses when the family lived in Nashville but that when they moved to Clarksville, he was placed in general classes despite needing help with reading and math. Ms. McKinney said that

-18-

the defendant had a large circle of friends and had good social skills, including the ability to understand and respond to emotions. She acknowledged that the defendant could have a mature conversation.

The defendant testified that in October of 2017, he was 17 years old and living with his mother and four younger siblings. He said that he was enrolled in a virtual high school. He acknowledged that he struggled with reading and was in special education classes for reading, math, and English. He said that in 2016, he "was like on the third or fourth grade reading level." He said that he would have difficulty understanding "complicated matters." He acknowledged that he had taken a government and civics class in school but said that it did not cover constitutional rights; "it wasn't none of that, it was about -- like 401K and how to use your money."

` The defendant said that when the officers came to his house on October 26, 2017, "three came in the house, two on the side and . . . one or two in the front yard." When he saw the officers, he was "[t]errified, scared." He said that Detective Arms introduced himself but did not tell him why he was there other than telling him "we need to take you down for questioning." The defendant said that he understood that to mean that the officers were going to take him "somewhere else" and that he "thought I had to go" and could not decline. When they arrived at the sheriff's office, he did not know that the detective's vehicle was unlocked and that he could get out of the vehicle on his own. He said that he thought that if he got out of the car and tried to leave that "they was going to try to shoot me or something because one dude was sitting beside me with a gun." The defendant said that he met Ms. McKinney at the front door and that the officers walked them to the interview room. He said that he did not believe that he could leave and acknowledged that he and Ms. McKinney never discussed leaving.

The defendant said that the detectives were talking "at the same time" while his rights were being read. He said that Detective Arms read the *Miranda* warnings to him "real fast" and that Detective Kendrick was also talking to him while Detective Arms was reading. The defendant said that he did not understand what was being read "at all." After the detective finished reading the warnings and as the defendant was signing the waiver, the detectives were "talking, talking, talking, trying to talk to me and my Mom" about "basketball, my siblings, my son and like sports stuff." The defendant acknowledged that he signed the waiver of rights but said, "I didn't read it or nothing." He said that if he had read the form, he "would have asked him more questions about it." He acknowledged that he did not try to stop the interview at any point, noting, "I thought I had to talk and had to sign that waiver, that paper." He said that he did not understand that he could have asked for an attorney to be present because "I didn't hear nothing about it." He said that he had not been in trouble before and that this was the first time he had been interrogated by police.

During cross-examination, the defendant said that as part of his virtual school, he could go to a location where people were available to help him, specifically, "special people for reading and math and all that other stuff." The defendant said that he was "classified as a Ninth Grader" based on his earned credits and that he was trying to catch up on credits through virtual school to graduate on time. The defendant acknowledged that he knew why the officers had come to his house. He said that when he left the house with the officers, he knew that Ms. McKinney was going to meet them at the sheriff's office. The defendant said that he and the officers chatted about the NBA and the video game NBA 2K. He said that he was experienced with the game and that he was pretty good at playing but that "it's not that hard to do." He acknowledged that he did not ask Ms. McKinney if he had to speak to the detectives or if he could leave the interview, explaining, "I thought we couldn't leave" and "had to" talk to them. He acknowledged that he told the detectives that he understood the rights that had been read to him.

On redirect examination, the defendant denied that he worked the cash register or the drive-through window at KFC and said that he was only "making the cookies, [and] mopping the floors." He said that the manager taught him how to make the cookies and that he did not have to read anything to learn his job.

At the end of the hearing, the trial court determined that the defendant was in custody for the purposes of *Miranda* during his interview at the sheriff's office. The trial court found that the defendant, who was three months from his 18th birthday, had held two jobs, had a passing grade in English, and had been deemed to be of "average intelligence" in his pretrial psychological evaluation. The court also found that there was no evidence of the defendant's intoxication or other impairment that would have diminished his capacity to understand the warnings. Finally, the court found that the defendant's mother was present for the duration of the interrogation. The trial court concluded that the defendant knowingly and voluntarily waived his rights and that his statement was admissible.

In this appeal, the defendant reasserts his argument that he did not knowingly and voluntarily waive his rights and that the trial court erred by denying his motion to suppress his statement. The State contends that the trial court did not err.[1]

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette,* 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings

---

[1] At the suppression hearing, the State also argued that the defendant was not in custody at the time of the interview for the purposes of *Miranda* but does not raise that argument on appeal.

of fact unless the evidence in the record preponderates against them. *Odom,* 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith,* 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan,* 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence" or police overreaching. *Bram v. United States,* 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly,* 603 S.W.2d 726, 728 (Tenn.1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante,* 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond,* 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith,* 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson,* 878 S.W.2d 530, 545 (Tenn. 1994), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003)); *see also State v. Thacker,* 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith,* 933 S.W.2d at 455-56 (quoting *Kelly,* 603 S.W.2d at 728 (internal citation and quotation marks omitted)).

A statement made "during a custodial interrogation is inadmissible at trial unless" the State can establish a knowing and voluntary waiver of the rights. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, 384 U.S. at 475. "The State bears the burden of establishing 'waiver by a preponderance of the evidence.'" *State v. Climer*, 400 S.W.3d

537, 564 (Tenn. 2013) (quoting *Berghuis*, 560 U.S. at 384). Although the State need not "show that a waiver of *Miranda* rights was express," the giving of an uncoerced statement following the provision of *Miranda* warnings, "standing alone, is insufficient to demonstrate 'a valid waiver.'" *Climer*, 400 S.W.3d at 564 (quoting *Miranda*, 384 U.S. at 475).

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Berghuis*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also Climer*, 400 S.W.3d at 564-65. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545). "Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the *Miranda* rights are explained." *Blackstock*, 19 S.W.3d at 208.

When the accused is a juvenile, the consideration of the totality of the circumstances must also include:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

> (2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;

> (3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;

> (4) any intoxication;

> (5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

*State v. Callahan*, 979 S.W.2d 577, 583 (Tenn. 1998). "These factors are sufficiently capacious to encompass coercive tactics such as . . . promising leniency." *Id.*

Because the test for voluntariness is the same regardless of whether the defendant was provided with *Miranda* warnings, *see Smith*, 933 S.W.2d at 455, and because the question whether the defendant voluntarily provided a statement to the police is inextricably linked with the question whether the defendant voluntarily waived his constitutional right to remain silent by providing a statement after the warnings were given, we will consider those issues together to determine whether, under the totality of the circumstances, the defendant's statement was freely and voluntarily given after a knowing and intelligent waiver of his constitutional rights.

Here, the detectives escorted the 17-year-old defendant and Ms. McKinney to a small interview room. The defendant was not physically restrained, but the detectives entered the room with guns visible, a clear show of authority. Detective Kendrick's statements that the detectives had "some questions we want to ask" and that they "want[ed] to hear . . . what's going on" implied an expectation for the defendant to talk with them after Detective Arms read the warnings. Although Detective Arms' reading of the *Miranda* warnings was breviloquent and monotonous, his words were coherent. More concerning than the detective's inartful reading was his telling the juvenile defendant that his signature on the waiver of rights form was solely to acknowledge that the detective had in fact read the form. Detective Arms read only the warnings from the form and neglected to read the statement of waiver above where he indicated the defendant was to sign. While it is true that the defendant acknowledged that he understood the warnings, neither detective asked the defendant whether he wished to waive his rights and speak with them. The defendant had never before been interrogated and had no prior experience with *Miranda* warnings. Although the defendant was nearing his 18th birthday, he was still a juvenile, in high school, and under the care and custody of his mother. His academic records established that he was respectful of and obedient to authority. In light of the defendant's youth, inexperience, and deference to authority, his mother's instructing him to tell the detectives what he knew, and the detectives' indicating that they expected him to talk to them, we conclude that the defendant would not have understood his right to stop the interview or decline to answer the detectives' questions. This is especially so considering that Detective Arms told the defendant to sign the waiver of rights form "just [to] say[] that I read this."

Furthermore, when Detective Arms gave the defendant the waiver form to sign, Detective Kendrick engaged Ms. McKinney in conversation about her other children, thus depriving the juvenile defendant of the opportunity to confer with his mother—within

the realm of social norms (i.e. not interrupting a conversation between adults)—before signing the form. Also, the defendant had documented difficulty with reading comprehension for which he was placed in special education classes, and, contrary to the trial court's finding, the defendant's academic records show that he earned a failing grade of 25 in English at West Creek High School in the Spring semester of 2017. Considering the defendant's difficulties with reading and the distracting conversation between Detective Kendrick and Ms. McKinney, it is unreasonable to expect the defendant to have been able to read and understand the waiver of rights form in that environment.

Based upon the totality of the circumstances, we conclude that the defendant did not freely and voluntarily give his statement after a knowing and intelligent waiver of his constitutional rights. Consequently, the defendant's statement should have been suppressed. Additionally, the evidence collected from the defendant's cellular telephone also must be suppressed because the detectives were able to access the telephone's data only because the defendant provided the passcode at the detectives' request as part of his involuntary statement.

Having determined that the trial court erred by denying the defendant's motion to suppress, we must next determine whether the error requires reversal of the defendant's convictions. *See State v. Climer*, 400 S.W.3d 537, 569 (Tenn. 2013) ("The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error, and as such, is subject to the harmless error analysis . . . ."). Whether the erroneous admission of evidence constitutes harmless error turns "not [on] whether the remaining admissible evidence presented at trial was sufficient to support Defendant's convictions" but on whether the State established "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *State v. Rodriguez*, 253 S.W.3d 361, 371 (Tenn. 2008)).

We conclude that the trial court's error was not harmless beyond a reasonable doubt. Not only was the defendant's statement and derivative evidence inadmissible, his trial testimony does not dispel the harm of the erroneous admission in this case. Although the defendant repeated the substance of his inadmissible statement in his trial testimony, when a defendant "testifie[s] only after the Government . . . illegally introduced into evidence . . . confessions, all wrongfully obtained, . . . the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby." *Harrison v. United States*, 392 U.S. 219, 222 (1968); *see also State v. Valentine*, 911 S.W.2d 328, 332 (Tenn. 1995) ("The primary concern of the *Harrison* Court was that the defendant should not be forced to choose between competing constitutional rights because of an illegality perpetrated by the [S]tate."). The State bore the burden to prove that the defendant's testimony was not induced by the erroneous admission of his pre-trial statements. *Harrison.* 392 U.S. at 224-25 ("Having . . . us[ed] the petitioner's unlawfully

obtained confessions against him, the Government must show that its illegal action did not induce his testimony.").  The State put forth no evidence to show that the defendant would have testified even if his pretrial statement had been suppressed or to dispel the inference that the defendant would not have made a damaging admission in his testimony.  *See id.* ("[E]ven if the petitioner would have decided to testify whether or not his confessions had been used, it does not follow that he would have admitted being at the scene of the crime and holding the gun when the fatal shot was fired.  On the contrary, the more natural inference is that no testimonial admission so damaging would have been made if the prosecutor had not already spread the petitioner's confessions before the jury.").

Without the defendant's pre-trial statement, data from his telephone, and trial testimony, the evidence against him was scant.  The only other evidence connecting him to the offenses was that he was pictured in a Facebook photograph of an unknown date wearing a bright green hooded sweatshirt similar to the one witnesses saw the shooter wearing, and that he was in the stolen Camaro with Mr. Murray at approximately 9:00 or 10:00 p.m. after the shooting.  The defendant's pretrial statements "were the foundation on which the remaining circumstantial evidence rested," *see id.* at 570, and the State has failed to establish that the erroneously admitted evidence did not contribute substantially to the jury's verdicts.

Consequently, the defendant's convictions are reversed, and the case is remanded for a new trial.

## II. Sufficiency of the Evidence

Next, the defendant challenges the sufficiency of the evidence as to his convictions, arguing that the State failed to present sufficient evidence to support his convictions and that the State failed to prove beyond a reasonable doubt that the defendant did not act in self-defense.

Although we have determined that the defendant's statement to police should have been suppressed, his statement was admitted into evidence, and its erroneous inclusion does not factor into our analysis of the sufficiency of the evidence.  *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981) (holding that even inadmissible evidence goes into a calculation of the sufficiency of the evidence).

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).  This court will neither re-weigh the

evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

## A. Evidence Supporting Convictions

As relevant here, "[f]irst degree murder is . . .[a] premeditated and intentional killing of another; [or] . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . [or] theft . . . ." T.C.A. § 39-13-202(a)(1), (2). "A homicide, once proven, is presumed to be second degree murder, and the State has the burden of proving the elements of premeditation and deliberation to raise the offense to first degree murder." *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999) (citing *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998)). In this context,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it [.]'" *Farmer*, 296 S.W.2d at 883 (quoting *Wharton on Homicide*, § 126 (3rd ed.)); *see also, e.g.*, *Banks*, 271 S.W.3d at 140; *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring "in the perpetration of" the felony offense, so long as there is a connection in time, place, and continuity of action.'" *Thacker*, 164 S.W.3d at 223 (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)).

"Aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon . . . ." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a).

Moreover, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id.* § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

Here, taken in the light most favorable to the State, the evidence adduced at trial established that the defendant, who was wearing a neon green hooded sweatshirt, traveled with Mr. Murray and Mr. Reed in a black Dodge Challenger to the Sudden Service gas station on Maxey Road for the purpose of robbing the victim of his 2015 Camaro. On the way to the gas station, the defendant texted a friend that he was going to "handle some business" and sent a photograph of himself wearing the green sweatshirt and holding two guns in his lap. Before getting out of the car, the defendant placed his gun in the pocket of his gym shorts, which he was wearing underneath his pants. At the gas station, the victim showed off his Camaro in an attempt to sell it and allowed Mr. Murray to get into the driver's seat. The defendant walked behind the victim, and as the victim neared the

-27-

passenger's side door of the Camaro, Mr. Murray drove away in the victim's car. Within seconds, the defendant shot the victim in the back and ran behind the gas station, where Mr. Reed picked him up in the Challenger and drove away from the scene. The events at the gas station were captured by surveillance cameras, and the video footage confirmed that the shooter was wearing a bright hooded shirt. The defendant later got into the stolen Camaro with Mr. Murray and rode with him to pick up Mr. Murray's brother from work before Mr. Murray drove the defendant to a friend's apartment. This evidence is sufficient to support the defendant's convictions for aggravated robbery, theft, and first degree felony murder.

The question of premeditation is a closer one. The State points to the defendant's carrying a gun the night of the shooting as evidence of his premeditation to kill the victim. Although it is true that a defendant's procuring a weapon prior to a killing can support a finding of premeditation, *see Bland*, 958 S.W.2d at 660, such a finding is not supported by the record in this case. The defendant testified that he routinely carried the gun for protection, and the State presented no evidence to the contrary and failed to establish that the defendant carried the weapon that night "for the specific purpose of killing the victim." *See State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992) ("Although the jury is permitted to disbelieve the defendant's testimony, it may not construct a theory based on no evidence at all."); *State v. Brandon Compton*, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992, at *5 (Tenn. Crim. App., Oct. 13, 2006) (citing *Jackson*, 173 S.W.3d at 410 n.5) ("[W]hile the Appellant possessed a weapon, there is no indication that he procured the weapon for the purpose of killing the victims. Simply going armed is not a basis for inferring premeditation to kill a specific victim.").

The State argues that the defendant's text message about "handl[ing] some business" and the photograph of his holding two guns shows that he knew of and participated in the plan to rob the victim of the Camaro. The defendant's intentional participation in the robbery, however, does not establish premeditation for the purpose of first degree murder.

The State also points to the defendant's "casual demeanor" after the killing as evidence of premeditation. The only evidence of the defendant's demeanor immediately after the shooting, however, was that he ran to the back of the gas station immediately after shooting the victim and fled the scene with a codefendant, actions that do not suggest calmness. Although Mr. Reffege testified that he saw the defendant in the Camaro with Mr. Murray several hours after the killing, he did not describe the defendant's demeanor or behavior during that encounter. What is more, "[e]vidence of Defendant's conduct at more remote points of time after the homicide is not directly probative of [d]efendant's mind set at the time of the killing." *State v. Long*, 45 S.W.3d 611, 622 (Tenn. Crim. App. 2000) (citing *West*, 844 S.W.2d at 148).

We conclude that the evidence adduced at trial was insufficient to establish the element of premeditation. The evidence was sufficient, however, to support a conviction of second degree murder. *See* T.C.A. § 39-13-210(1)(a) ("Second degree murder is . . . [a] knowing killing of another . . . ."). Because the defendant's convictions are reversed, upon retrial, the State will be limited to trying the defendant for the lesser charge of second degree murder in place of the first degree premeditated murder charge.

## B. Self-Defense

Next, the defendant contends that the evidence established that he had a reasonable belief that he was in imminent danger of death or serious bodily injury, justifying his shooting the victim in self-defense.

Whether the defendant acted in self-defense is a question of fact for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994) (citing *State v. Williams*, 784 S.W.2d 660 (Tenn. Crim. App. 1989)). "Thus, in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *Id.*

The trial court instructed the jury as to the justification of self-defense, and the jury heard the defendant's testimony and argument that he feared for his life when he saw the victim reach for his holstered gun. The State, however, presented sufficient evidence from which the jury could have concluded that the defendant did not act in self-defense. The jury resolved any issues of credibility and conflicting evidence and rejected the defendant's assertion of self-defense, as was their prerogative.

## Conclusion

The trial court erred.

_____
JAMES CURWOOD WITT, JR., JUDGE

-29-